## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**CHRISTOPHER ROBERTS, CAITLIN THROCKMORTON, BRANDY MOORE, CARTER HUBBS,** and **JESSICA SCHAFER** individually on behalf of themselves, and all others similarly situated,

      Plaintiff,

v.                              Case No. 8:23-cv-2447-WFJ-CPT

**PUBLIX SUPER MARKETS, INC**.,

      Defendants.

_____/

## <u>ORDER</u>

Before the Court is Named Plaintiffs', along with 97 Opt-In Plaintiffs, ("Named Plaintiffs" or "Plaintiffs") Renewed Motion to Conditionally Certify an FLSA Collective Action under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"). Dkt. 127; Dkt. 127-2. Publix Super Markets, Inc., ("Publix" or the "Defendant") responded in opposition, and Plaintiffs replied. Dkt. 142; Dkt. 151. Publix also filed a Motion to Sever the Named Plaintiffs' claims, not addressed here. Dkt. 137; Dkt. 141. The Court also held a hearing on the motions and took post-hearing briefings. Dkts. 155 & 156. The Court denies Plaintiffs' Renewed Motion to Conditionally Certify an FLSA Collective Action.

## BACKGROUND

Named Plaintiffs are all former Publix employees who either worked as hourly non-exempt Department Managers ("DMs") or Assistant Department Managers ("ADMs") (together, "DMs/ADMs") for Publix Super Markets.[1] Named Plaintiffs assert, individually and on behalf of all others similarly situated, that Defendant violated the FLSA by subjecting DMs/ADMs to common policies and practices which required them to work off-the-clock without being paid overtime. *See* Dkt. 25.

### I.     Factual History

Publix is a regional supermarket chain with 1,377 locations across eight states, employing more than 255,000 associates. Dkt. 142 at 2. Each Publix location generally has six departments—grocery, produce, meat, bakery, deli, and customer service. *Id.* Within each department are DMs and ADMs, all of whom are full-time hourly employees eligible for overtime. *Id.* Between December 2020 to December 2023, Defendant estimates it had more than 29,000 DMs and ADMs across all locations. *Id.* DMs/ADMs comprise roughly 12% of Publix's total associate population at any given time. *Id.* at 3.

---

[1] Plaintiffs have defined this FLSA Collective as "All Department Managers and Assistant Department Managers who worked in Publix's Deli, Bakery, Customer Service, Meat, Produce, or Grocery Departments who worked over 40 hours in any workweek in Publix's stores throughout the United States, on or after [January 11, 2021,] to the date of judgment." Dkt. 25 ¶ 30; Dkt. 127 at 1 n.3.

To manage payroll and overtime, Publix has "Labor Forecasts" (aka "Labor Budgets") that determine the labor needs of each store, even going so far as to forecast the needs of each department. *Id.* This "intricate system" allows Defendant to assign hours "based on the specific items sold within particular stores (and their departments), venues and services offered, and the layout of each particular store." *Id.* at 5. However, despite this individualized approach, Publix's labor budget only allocates a certain number of hours each week for ADMs and DMs—45 and 47.5 labor hours per week, respectively (until January 2023, when DMs were reduced to 45 hours). Dkt. 142 at 8; Dkt. 127-9 at 69:17-70:13, 102:2-12.

Plaintiff alleges that because the work DMs/ADMs do "cannot be completed within the hours Publix allocates, [these employees] are compelled to work off-the-clock so that their reported hours remain within the labor budget." Dkt. 127 at 9. While no explicit policy forces employees to comply with the hourly caps, Plaintiffs argue "negative pressures" from supervisors and upper management have created a *de facto* policy to not report overtime hours. *Id.* at 13, 29.[2]

Plaintiffs alleged four types of unpaid work: (1) pre-shift off-the-clock work, including bringing in shopping carts, assisting customers, and preparing the store for opening; (2) post-shift off-the-clock-work such as stocking shelves, assisting

---

[2] Plaintiffs contend these "negative pressures" flow from being listed on Publix's "overtime report." Dkt. 127 at 12. Being listed on the report can lead to "negative impacts" like "verbal reprimands by store managers, counseling by supervisors, formal written discipline, threats of additional discipline, negative performance evaluations, and decreased opportunities for promotion." *Id.*

customers, and responding to management requests; (3) off-the-clock work during unpaid meal breaks like assisting customers and co-workers, completing paperwork, and delivering goods to other stores; and (4) off-the-clock communications via texting, emailing, and phone calls while off-shift. *Id.* at 13–16.

Additionally, Plaintiffs claim DMs/ADMs are all subject to a common policy via an error in bonus calculation. The bonus is not mentioned in the section labeled "FLSA Collection Action Allegations" or the prayer for relief. Dkt. 25 at 8–10. Reference to the bonus calculation is one sentence in the Amended Complaint. The one sentence states: "Additionally, Non-exempt Hourly Managers receive several non-discretionary bonuses throughout the year which would need to be included in their regular rate of pay when calculating the correct and complete overtime rate of pay, as prescribed by the FLSA." *Id.* ¶ 59.

## II.    Procedural History

On October 26, 2023, the five Named Plaintiffs filed the instant collective action on behalf of themselves and other current and former Publix DMs/ADMs. Dkt. 1. One month later, Plaintiffs filed an Amended Complaint alleging that they and other similarly situated DMs/ADMs were not paid for all their overtime hours as required by the FLSA. Dkt. 25.

On January 11, 2024, Plaintiffs filed their initial motion for conditional certification of an FLSA collective. Dkt. 53. However, due to the potential size and

scope of the instant collective action, Publix requested the Court allow for a pre-notice "limited expedited discovery" phase. Dkt. 46. This Court granted Publix's request on January 26, 2024, and set a deadline for Plaintiffs to file a renewed motion for conditional certification. Dkts. 81, 86, & 102.

The five-month discovery period closed on July 3, 2024. An extensive amount of pre-notice discovery was produced during this five-month period. Both parties exchanged written discovery (10 sets by Publix, one by Plaintiffs), Defendant deposed four named plaintiffs and four opt-ins, and Plaintiffs deposed one witness twice, once in her personal capacity and once as Publix's corporate representative. *See* Dkts. 127-1. Each side has also produced thousands of pages of documents as well. Dkt. 127 at 16; Dkt. 142 at 11-13.

Plaintiffs filed their renewed motion on July 26, 2024. Dkt. 127. In response, Publix filed a motion asking this Court to sever all Named Plaintiffs except Christopher Roberts pursuant to Fed. R. Civ. P. 20 and 21. Dkt. 137.[3]

## LEGAL STANDARD

## I.   FLSA Conditional Certification under 29 U.S.C. § 216(b)

The FLSA authorizes collective actions against employers by providing that "[a]n action . . . may be maintained against any employer . . . by any one or more

---

[3] Publix has also objected to several declarations that Plaintiffs submitted in support of their renewed motion. *See* Dkts. 144 & 145. Because the Court is denying Plaintiffs' renewed motion for certification, Defendant's motions are denied as moot. Additionally, the Court finds Plaintiffs' original motion for conditional certification, Dkt. 53, is moot.

employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Collective actions under the FLSA serve two purposes: "(1) reducing the burden on plaintiffs through the pooling of resources, and (2) efficiently resolving common issues of law and fact that arise from the same illegal conduct." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1264–65 (11th Cir. 2008) (citing *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).

To successfully opt in, "plaintiffs must demonstrate that they are 'similarly situated.'" *Calderone v. Scott*, 838 F.3d 1101, 1104 (11th Cir. 2016) (quoting 29 U.S.C. § 216(b)). Courts have adopted various ways of considering this issue. In a much smaller collective action case that does not resemble the present one, the Eleventh Circuit suggested a two-step certification process for district courts to consider:

> The first determination is made at the so-called "notice stage." At the notice stage, the district court makes a decision—usually based only on the pleadings and any affidavits which have been submitted—whether notice of the action should be given to potential class members.
>
> Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in "conditional certification" of a representative class. . . .
>
> The second determination is typically precipitated by a motion for "decertification" by the defendant usually filed after discovery is largely complete and the matter is ready for trial. At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question.

6

*Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1218 (11th Cir. 2001) (internal quotations and citation omitted).

Under any approach, a plaintiff has the "burden of showing a 'reasonable basis' for his claim that there are other similarly situated employees." *Morgan*, 551 F.3d at 1260 (citations omitted). While this burden at the notice stage "is not heavy, it is not 'invisible.'" *Lewis-Gursky v. Citigroup, Inc.*, No. 815CV2887T24MAP, 2017 WL 892604, at *3 (M.D. Fla. Mar. 6, 2017) (quoting *Hart v. JPMorgan Chase Bank, N.A.*, 8:12–cv–00470–T–27TBM, 2012 WL 6196035, at *5 (M.D. Fla. Dec. 12, 2012)). The decision to conditionally certify an FLSA collective action is at the district court's discretion. *Morgan*, 551 F.3d at 1261; *see also Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953–54 (11th Cir. 2007) (emphasizing the "range of choice" enjoyed by district courts in making collective action certification decisions under section 216(b) (quotation marks and citation omitted)).

## II.   The Court's Approach to Certification in Light of the Pre-Notice Discovery and Size of the Case

Both parties have devoted substantial time to arguing which analytical approach the Court should take. *See generally* Dkts. 127, 143, 151, 155, 156. Plaintiffs ask this Court to apply a lenient standard because this case is at the notice stage. Dkt. 127 at 21. Conversely, Publix asks the Court to apply a more "searching inquiry" due to the "sheer number of potential participants, the number of individual

retail locations involved, the nature of Plaintiffs' claims and Publix's defenses, the discovery already conducted, [and] the abject impossibility of managing such a variably and broadly scoped collective action trial[.]" Dkt. 142 at 15.

The Court finds Defendant's argument persuasive and supported by other district courts in this Circuit. *Hipp*'s two-step approach is a suggested framework from a case not resembling this one. "Nothing in [Eleventh] circuit precedent . . . requires district courts to utilize this approach." *Hipp*, 252 F.3d at 1219; *Mickles v. Country Club Inc.*, 887 F.3d 1270, 1276–77 (11th Cir. 2018). As the Eleventh Circuit teaches, "[t]he decision to create an opt-in class under § 216(b), like the decision on class certification under Rule 23, remains soundly within the discretion of the district court." *Hipp*, 252 F.3d at 1219.

Moreover, one only needs to consider the facts of *Hipp* to see the stark differences from the instant case. *Hipp* involved over twenty opt-in plaintiffs, several of whom were untimely. *Hipp*, 252 F.3d at 1215. Of the ten plaintiffs that went to trial, only seven prevailed on their age discrimination claims. *Id.* If the instant collective is certified, it would be over 2,000 times larger than the class that ultimately went to trial in *Hipp. See Holmes v. Quest Diagnostics, Inc.*, No. 11–80567–CIV, 2012 WL 12876965, at *3 (S.D. Fla. June 14, 2012) (finding "the similarity requirement must be applied with some rigor" since the case involved 15,000 potential plaintiffs). Put simply, *Hipp* has no resemblance to the instant

proceeding. *Hipp* did not involve the same level of multifarious, unique, and discrete issues of fact present for each putative Plaintiff in the instant motion.

In this case, the voluminous record from the five-month pre-notice discovery phase demonstrates the "rationale for a more lenient standard at the preliminary stage of a case [has] disappear[ed]." *Lewis-Gursky*, 2017 WL 892604, at *4 (citations omitted) ("It makes little sense to allow significant time to conduct discovery on the conditional certification question and then to hold Plaintiff to the 'fairly lenient,' pre-discovery *Hipp* standard. Therefore, a more rigorous standard than that called for by *Hipp* is appropriate.").[4] Accordingly, the Court will apply a more rigorous conditional certification standard.

## DISCUSSION

### I.   Conditional FLSA Collective Action Certification

A plaintiff seeking conditional certification under section 216(b) must demonstrate that "there are other employees (1) who desire to join the lawsuit and

---

[4] *See also Udo v. Lincare*, No. 8:13–cv–1899–T–23TGW, 2014 WL 5354589, *10 (M.D. Fla. Sept. 17, 2014) (finding *Hipp* step one seemed inapt when seven months of ongoing discovery had been conducted); *Holmes*, 2012 WL 12876965, at *3 (S.D. Fla. June 14, 2012) (applying a heightened conditional certification standard when discovery had been ongoing for six months); *Mennucci v. Randstad Pros. US, LLC*, No. 1:19-CV-4693-TWT, 2021 WL 4804358, at *3 n.2 (N.D. Ga. Oct. 14, 2021) (declining to apply *Hipp* step one because discovery was open for more than a year when the plaintiff filed his renewed motion for certification); *Walker v. Jefferson*, Case No. 2:130CV0524– RDP, 2016 WL 1117643, at *4 (N.D. Ala. Mar. 22, 2016) (finding a more searching standard of review is appropriate when an FLSA case is in a more advanced posture than envisioned in *Hipp* step one); *Pickering v. Lorillard Tobacco Co., Inc.*, No. 2:10-CV-633-WKW, 2012 WL 314691, at *9 (M.D. Ala. Jan. 30, 2012) (applying a heightened standard beyond *Hipp* step one after four months of discovery); *Ledbetter v. Pruitt Corp.*, No. 05–cv–329, 2007 WL 496451, at *2 (M.D. Ga. Feb. 12, 2007) (noting the case was "in a different procedural posture than that envisioned by *Hipp*" and "therefore a more searching standard of review [was] appropriate" because discovery had already ended); *cf. Thomas v. Waste Pro USA, Inc.*, 360 F. Supp. 3d 1313, 1320 (M.D. Fla. 2019) (continuing to apply *Hipp* step one because "[t]his case did not involve bifurcated discovery during which Plaintiff was specifically granted time to discover matters related to certification").

(2) who are similarly situated with respect to their job requirements and pay provisions." *Guerra v. Big Johnson Concrete Pumping, Inc.*, No. 05-14237-CIV, 2006 WL 2290512, at *2 (S.D. Fla. May 17, 2006) (citing *Dybach v. State of Fla. Dep't of Corr.*, 942 F.2d 1562, 1567–68 (11th Cir. 1991)).

As an initial matter, Plaintiffs have met their burden of establishing that there are other DMs/ADMs who desire to join this lawsuit. Plaintiffs currently have 97 current and former DMs/ADMs who have opted into this action, with 44 opt-ins having submitted sworn declarations. *See* Dkt. 127-19. Rather, the heart of the parties' dispute is whether the potential plaintiffs in this case are "similarly situated."

## II.   Plaintiffs have failed to demonstrate they are "similarly situated" under the FLSA

"Similarly situated" is not statutorily defined, and the Eleventh Circuit has not "adopted a precise definition of the term." *Morgan*, 551 F.3d at 1259–60. However, courts in this district have considered five factors when making a "similarly situated" determination:

> (1) whether the plaintiffs all held the same job title; (2) whether they worked in the same geographical location; (3) whether the alleged violations occurred during the same time period; (4) whether the plaintiffs were subjected to the same policies and practices, and whether these policies and practices were established in the same manner and by the same decision-maker; [and] (5) the extent to which the actions which constitute the violations claimed by plaintiffs are similar.

*Thomas v. Waste Pro USA, Inc.*, 360 F. Supp. 3d 1313, 1321–22 (M.D. Fla. 2019) (quoting *Franco v. Bank of Am. Corp.*, 691 F.Supp.2d 1324, 1326 (M.D. Fla. 2010));

*see also Gibbs v. MLK Express Servs., LLC*, No. 218CV434FTM38MRM, 2019 WL 2635746, at *4 (M.D. Fla. June 27, 2019) (applying the same factors). The Court now addresses these five factors.

Here, some factors are straightforward and can be dispensed with quickly. When strictly defining "job title," factor one favors conditional certification as all named and opt-in Plaintiffs are current or former hourly non-exempt "Department Managers" and "Assistant Department Manages" with Publix. Dkt. 142 at 1. But, for example, what a deli ADM in Coconut Grove, Florida and a deli ADM at the Senoia, Georgia Publix might do is likely different. *See* Dkt. 142-1 at ¶¶ 13-14 ("A store that sells significantly more sub sandwiches than average will be allocated more hours in the deli than other stores due to its product mix and customers' desire for service. Stores located near colleges will require labor at different times throughout the day than a store in a retirement community."). A customer service manager in Key West likely serves a different clientele than the manager in Fayette County, Kentucky.

Next, factor two (geographical proximity) plainly weighs against certification. Plaintiffs seek nationwide certification of all current and former DMs/ADMs "who worked at all Publix locations" over a three-year period. Dkt. 127 at 34. Publix contends this would include "more than 25,000 current and former" DMs/ADMs "who have worked at different times, in two distinctive roles, in six unassociated

departments, in nearly 1,400 grocery stores, [across] eight states." Dkt. 142 at 1. These stores can be as much as 1,300 miles apart.

Factor three (temporal proximity) supports certification. All the alleged violations roughly occurred within the last three years. Dkt. 127 at 33 n.25.

The Court now turns to the fourth factor, which considers a "common policy or plan." The Court finds the tens of thousands of potential Plaintiffs located throughout the Southeastern United States are not "similarly situated" via a common policy or plan that violates the FLSA.

Plaintiffs point to two possible policies and/or practices that bind a potential class together. First, Publix allegedly has a *de facto* policy requiring DMs and ADMs to work overtime based on the company's labor budgets. Defendant's strict adherence to the labor budget—coupled with the imposition of unreasonable amounts of work—has implicitly created a common policy where employees work off the clock without overtime pay. Dkt. 127 at 9, 23, 29. Second, Plaintiffs assert in one sentence of the Amended Complaint that bonus payments were not properly included in the shorted overtime. Dkt. 25 ¶ 59. Publix vigorously disputes such allegations. Defendant argues that its 45-hour scheduling goal for DMs and ADMs is perfectly lawful and bonus calculations include overtime properly. Dkt. 142 at 19-22.

"One way for plaintiffs to show employees are similarly situated is through a common policy or plan that violated the FLSA." *Gibbs*, 2019 WL 2635746, at *6. Evidence of a common or unified policy or plan is "relevant to the Court's exercise of discretion in granting conditional certification in order to satisfy the rationale of a collective action, which is to preserve judicial economy." *Id.* (citations omitted). When considering a common policy or plan, a court should look for "detailed allegations regarding the common policy, plan, or scheme that allegedly forms the basis of the alleged FLSA violations." *Id.* (quoting *Layton v. Percepta, LLC*, No. 6:17-cv-1488-Orl-41DCI, 2018 WL 5492850, at *3 (M.D. Fla. Sept. 21, 2018), *report and recommendation adopted*, 2018 WL 5442729 (M.D. Fla. Oct. 29, 2018). However, courts in this district have also relied on a plaintiff's failure to show a common policy or plan in denying conditional certification. *See e.g., Gibbs*, 2019 WL 2635746, at *6; *Layton*, 2018 WL 5492850, at *3; *Chalker v. Burlington Coat Factory of Fla., LLC*, No. 8:12-cv-2755-T-23TBM, 2013 WL 5954783, at *2–3 (M.D. Fla. Nov. 7, 2013).

Concerning the alleged *de facto* policy of forced overtime, Publix's written companywide policy prohibiting non-exempt employees from working off the clock counsels against certification. Publix's managers reference library has a range of policies "prohibiting off-the-clock work, requiring reporting of all time worked, barring managers from creating policies that conflict with Publix's prohibition on

off-the-clock work, and requiring that managers ensure the associates they oversee clock in and out properly, as well as do not perform any work while off the clock." Dkt. 142 at 6; Dkt. 127-9 at 123:11-17. Further, if employees have to work overtime, Publix pays those employees for any reported off-the-clock work. Dkt. 127-9 at 29:5-21, 30:18-31:6, 79:1-80:15, 124:1-8.

However, Plaintiffs correctly note that "the mere fact that a company has a written overtime policy does not defeat conditional certification when a plaintiff provides countervailing evidence of a common policy of not paying for overtime." Dkt. 127 at 29 (quoting *Devries v. Morgan Stanley & Co. LLC*, No. 12-81223-CIV, 2014 WL 505157, at *6 (S.D. Fla. Feb. 7, 2014)). Plaintiffs point to several depositions to support their claim that DMs/ADMs were discouraged, pressured, and/or disincentivized from reporting off-the-clock work to stay within Publix's labor budgets. Dkt. 127 at 9–10; *see* Dkt. 127-16 at 124:21-25; Dkt. 127-8 at 29:15-15, 30:1-13, 31:11-21, 37:3-7, 42:13-16; Dkt. 127-12 at 71:12-72:8; Dkt. 127-10 at 113:4-114:22; Dkt. 127-13 at 106:20-107:16. Further, Plaintiffs assert DMs/ADMs face adverse employment consequences if they do exceed the labor budget, including "verbal coaching/reprimands, threats of written reprimand, [] shaming," and

negative impacts to future promotion. Dkt. 127 at 10 (cleaned up) (citing several Plaintiff depositions).[5]

Nevertheless, the pre-notice discovery has shown Publix's policies prohibiting off-the-clock work are not merely "paper tigers." Dkt. 142 at 6; *see Devries*, 2014 WL 505157, at *6 ("[A]n employer's responsibility under the FLSA extends beyond merely promulgating rules to actually enforcing them."). There is evidence Publix has fully paid employees for working overtime and terminated employees for repeated violations of its off-the-clock policies. Dkt. 142 at 6; Dkt. 127-8 at 73:12-21; Dkt. 127-17 at 123:18-124:16; Dkt. 127-14 at 90:1-15; *see also* Dkt. 127-12 at 122:11-25, 126:2-14, 127:20-23, 133:9-25 (deposition of opt-in Plaintiff Jason Hash indicating he had been paid double time compensation for off-the-clock work but subsequently terminated for repeated violations of Publix's off-the-clock policies); Dkt. 127-13 at 126:5-17, 129:22-25 (deposition of opt-in Plaintiff Kristopher Rojo stating he had been disciplined for violating Publix's off-the-clock policies).

Plaintiffs seek to show Publix's enforcement of its off-the-clock policies and strict adherence to its labor budgets as evidence of a *de facto* policy to force

---

[5] As discussed in further detail below, even if a common scheme by Publix to force its employees to under-report work hours existed, the pre-notice discovery illustrates that certification would be inappropriate "because the diversity of the proposed class would lead to individualized inquiries and would eviscerate the judicial economy otherwise served by conditional class certification." *Reyes v. Strada Servs. Inc.*, No. 8:21-CV-976-VMC-TGW, 2021 WL 4427079, at *5 (M.D. Fla. Sept. 27, 2021); *Lewis-Gursky*, 2017 WL 892604, at *5. In so finding, the Court does not express any opinion on the merits of any individual Plaintiff's case.

employees to work overtime without pay. But, unlike other cases where a defendant would refuse to pay employees for overtime hours, encourage them to understate their hours, or manipulate employee timesheets,[6] Publix allows its employees to work the maximum number of hours allowed under its labor budget and pays DMs/ADMs who report working overtime. *See e.g.*, Dkt. 127-15 at 86:18-87:2, 89:12-90:8; Dkt. 127-10 at 123:3-8.

Both parties vigorously dispute how the bonuses are calculated and distributed to employees. Publix asserts that this Court does not even need to consider Plaintiff's arguments because the bonus calculations were previously "blessed" by another district court in 2015, and "the methodology remains unchanged in all material respects." Dkt. 142 at 33 (citing *White v. Publix Super Markets, Inc.*, No. 3:14-CV-1189, 2015 WL 4949837, at *18 (M.D. Tenn. Aug. 19, 2015)). Plaintiffs, however, argue *White* is inapposite. Dkt. 151 at 8 n.17.

Plaintiff's Amended Complaint makes it clear they are not challenging Publix's bonuses as a policy or plan that independently violates the FLSA. Dkt. 25 ¶ 51. The Amended Complaint discusses the bonuses in a single sentence that is subsumed in Plaintiffs' singular cause of action for unpaid overtime wages. *See id* ¶

---

[6] *See Devries*, 2014 WL 505157, at *6; *Sterling v. Bridgewater & Assocs.*, No. 1:12-cv-1024-WSD, Dkt. 34 at 9-10 (N.D. Ga. Jan. 22, 2013); *Foster v. Suntrust Mortg., Inc.*, No. 1:12-cv-1716-WSD, Dkt. 82 at 16-17 (N.D. Ga. Feb. 4, 2013).

59. Thus, the bonus calculation issue is purely derivative of the amount of unpaid overtime each Plaintiff was allegedly shorted.

This distinction is critical since Plaintiffs and Publix have been incorrectly treating the bonus as a totally separate cause of action rather than one sentence in the Amended Complaint. *See* Dkt. 127 at 17; Dkt. 151 at 8 n.17; Dkt. 142 at 33-34. The question is whether Plaintiffs are "similarly situated" enough for conditional certification due to unpaid overtime wages, which might include unpaid bonuses in the overtime pay that was shorted. Whether a single putative member's bonus was underpaid as part of his unpaid overtime would involve "individualized inquiries," part of and partly derivative of whether the DM/ADM was shorted "off the clock" overtime. Whether bonus calculation is at issue or not does not relieve the numerous plaintiff-specific inquiries. They would include "whether plaintiffs actually worked 'off the clock,' whether plaintiffs modified their time records to reflect the actual time worked, whether plaintiffs' supervisors were aware of any 'off-the-clock' work, . . . , [] whether any 'off-the-clock' work fell within the *de minimis* exception to the FLSA," *Hart*, 2012 WL 6196035, at *5, and whether any unpaid overtime wages due also included properly calculated bonuses.

Accordingly, factor four, which considers commonality of the offending policy, militates against certification since there is no policy or practice that violates

the FLSA which is sufficiently clear to bind together a potential class this massive, this disparate, and this individualized.

The fifth and final factor addresses the commonality of the alleged specific FLSA violations visited upon each member. Plaintiffs eschew this consideration. They assert any variations in the "what," "when," "why," and "how" Plaintiffs did off-the-clock work is irrelevant at the certification stage of the proceeding. Dkt. 127 at 31-32. Instead, the only thing that matters "is that they did work off the clock, that [Defendants] required or permitted them to do so, and that they were not paid statutory overtime that was otherwise due." *Id.* at 32 (quoting *Chen v. Wow Rest. TH LLC*, No. 8:22-CV-2774-VMC-MRM, 2023 WL 3092618, at *3 (M.D. Fla. Apr. 26, 2023)). Conversely, Publix argues that five months of discovery shows "individual determinations exist for each of Plaintiffs' pre-shift, post-shift, meal break, and texting-related claims," which proves "certification in this case will never be proper." Dkt. 142 at 25. After exercising its discretion to apply a more discerning certification standard, the Court agrees with Defendant.

Plaintiffs state this Court must delay a more detailed inquiry to a later stage because "merits determinations" are "irrelevant at this stage." Dkt. 127 at 30. Such a position might be applicable when considering a simple, non-complex certification like *Hipp*. But this Court—applying a more rigorous standard due to the five months of limited pre-notice discovery—will not ignore the substantial evidence before it.

Refusing to look at the discovery "would potentially result in the Court granting Plaintiffs' motion for conditional certification despite already possessing evidence which would require it to grant a motion for decertification." *Green v. Atlas Senior Living, LLC*, 2022 WL 2007398, at *5 (S.D. Ga. June 6, 2022). Further, Plaintiffs had every opportunity to do further discovery but only took two depositions (of the same person) out of the ten this Court allowed and only sent Publix one set of interrogatories to answer.

The "individualized inquiries" factor asks the court to determine the "extent to which the actions which constitute the violations claimed by plaintiffs are similar." *Thomas*, 360 F. Supp. 3d at 1321–22. Several cases in this circuit have also considered "whether inevitable individualized inquiries lean against conditional certification at the notice stage." *Gibbs*, 2019 WL 2635746, at *8 (collecting cases); *Hart*, 2012 WL 6196035, at *5 ("These individualized inquiries make the certification of a collection action in this proceeding unwarranted.").[7] As such, a determination on whether Plaintiffs are too individualized enables this Court to determine whether the DMs/ADMs are "similarly situated." *See Gibbs*, 2019 WL 2635746, at *8; *Lewis-Gursky*, 2017 WL 892604, at *7; *Udo v. Lincare, Inc.*, No. 8:13-cv-1899-T-23TGW, 2014 WL 5354589, at *11-12 (M.D. Fla. Sept. 17, 2014).

---

[7] *See also Layton*, 2018 WL 5492850, at *4; *Chalker*, 2013 WL 5954783, at *3; *Kelley v. Taxprep1, Inc.*, No. 5:13-cv-451-Oc-22PRL, 2014 WL 10248251, at *2 (M.D. Fla. Apr. 2, 2014); *West v. Verizon Commc'ns, Inc.*, No. 8:08-cv-1325-T-33MAP, 2009 WL 2957963, at *7 (M.D. Fla. Sept. 10, 2009); *Herrera v. Mattress Firm, Inc.*, No. 17-22048-CIV-ALTONAGA/Goodman, 2017 WL 4270619, at *7 (S.D. Fla. Sept. 26, 2017).

In this case, a close examination of the discovery reveals Plaintiffs' pre-shift, post-shift, meal break, and texting off-the-clock claims are so individualized that they swamp any commonality that might be present. *See, e.g.*, *Lewis-Gursky*, 2017 WL 892604, at *5 (denying a motion for conditional certification "because the diversity of the proposed class would lead to individual inquiries that would "eviscerate[ ] all notions of judicial economy that would otherwise be served by conditional class certification"). This flaw is amplified by the simply massive and diverse size and nature of this potential class.

Plaintiffs first allege that they worked off-the-clock before shift, after shift, and during meal breaks. Dkt. 127 at 13-14. The pre-shift and post-shift off-the-clock work included bringing in shopping carts from the parking lot, assisting customers, fixing displays, preparing the store for opening, performing safety checks, picking up items from other stores, and restocking shelves. *Id.* But as the pre-notice depositions reveal, whether a given DM or ADM even worked off-the-clock, how long it took to complete such work, whether a supervisor ordered the additional work (or an employee was simply being proactive), and what type of work the employee completed are all questions whose answers varied from Plaintiff to Plaintiff.

For example, South Florida DM Kristopher Rojo[8] stated Publix "expected" him to work off-the-clock to help customers and not record the time. Dkt. 127-13 at 130:7-18. This expectation had been mandated by "every store manager that I work[ed] with." *Id*. However, Atlanta DM Jessica Schafer[9] noted that if she saw an assistant department manager clocking in before helping a customer, "then I'm just going to let them clock in early and then, you know, continue to watch the overtime report and make sure if I need to trim that later I do." Dkt. 127-14 at 118:1-10. Schafer made it clear if she asks an ADM or an associate to do more work, "I'll tell them to go hit the clock again[,] and I'll adjust their time because that will show an extra punch and then I would edit [their] time there." Dkt. 127-14 at 86:17-87:9. Further, Tampa DM Jason Hash's[10] reasons for working off the clock were not because Publix forced him to do so; rather, Hash had "role models" who he "looked up to," including one manager who worked an extra two hours after clocking out. Dkt. 127-12 at 75:8-15. While that manager recommended Hash *not* follow their example of working off the clock, Hash recalls another manager "bragging" about working during lunch breaks. *Id.* at 75:14-23.

---

[8] Kristofer Rojo worked at various stores in Florida (Westin, Miramar, Dania Beach, Sarasota, and Cooper City) as a DM in the grocery department. *See* Dkt. 127-2 at 4; Dkt. 127-13 at 11:8-16:25.
[9] Jessica Schafer worked at various stores in Atlanta, Georgia, as a DM in the customer service department. *See* Dkt. 127-2 at 3; Dkt. 127-14 at 49:4-52:18.
[10] Jason Hash worked at various stores in Tampa, Florida, as a DM in the bakery department. *See* Dkt. 127-2 at 3; Dkt. 127-12 at 17:13-20:21, 45:8-25.

There are also individual variances about whether Publix knew about the type of off-the-clock work done (the Court, however, assumes without deciding that store management knowledge can be imputed to Publix). For instance, when Georgia and Florida DM Travis Berry[11] decides to communicate with vendors while off-the-clock without being ordered to do so, it involves a totally separate inquiry from instances where North and South Carolina ADM Angela Bridges[12] would be ordered by her supervisor to pick up inventory from other stores before her shift. Dkt. 127-11 at 144:21-145:7; Dkt. 127-15 at 140:15-142:6. Similarly, when Schafer decides to pick up trash in an Atlanta parking lot while walking into work, it fails to shed any light on whether the Tennessee management in Christopher Roberts'[13] Chattanooga store knew he worked on missing deli sign tags before clocking in. Dkt. 127-14 at 79:12-24; Dkt. 127-10 at 91:1-16.

Next, there is substantial variance in the time it takes to complete off-the-clock work between each Plaintiff. For example, instances of alleged overtime work would only take a *de minimis* amount for a plaintiff, like 60 seconds to pick up a piece of trash or a couple of minutes to bring in a cart from the parking lot while walking into the store. Dkt. 127-14 at 79:12-24, 186:22-187:7; Dkt. 127-15 at 106:20-24. On the

---

[11] Travis Berry worked at various stores in Georgia (Savannah and Atlanta) and Florida (Miami) as a DM in the grocery department. *See* Dkt. 127-2 at 3; Dkt. 127-11 at 11:1-21:25.
[12] Angela Bridges worked at various stores in North Carolina (Hendersonville) and South Carolina (Furman) as an ADM in the deli department. *See* Dkt. 127-2 at 4; Dkt. 127-15 at 23:19-25:25.
[13] Christoper Roberts worked at various stores in Tennessee (Chattanooga and Cleveland) as an ADM in the deli department. *See* Dkt. 127-2 at 1; Dkt. 127-10 at 32:7-24, 35:1-10.

other hand, some Plaintiffs would consistently do substantial amounts of unpaid overtime. Hash testified he would do an average of 30 minutes of off-the-clock work in Tampa every shift, with an instance of working three hours before his start time when upper management was coming to visit the store. Dkt. 127-12 at 70:11-71:7. Roberts communicated that his start time would be 7:00 AM, but he would consistently come in at 6:15 or 6:30 AM to do off-the-time work. Dkt. 127-10 at 93:7-94:25. Bridges, in contrast, estimates she only did five or ten minutes of additional work before or after her shift. Dkt. 127-15 at 56:2-13.

Additionally, Plaintiffs have varying individual inquiries about the type of post-shift work done. Bradenton DM/ADM Carter Hubbs[14] testified that some of his post-shift work stemmed from having difficulty clearing other associates out of the store after he clocked out. Dkt. 127-8 at 77:24-78:21. Rojo also stated that when he was getting close to his maximum hour allowed under the labor budget, he would voluntarily go work at another store to finish paperwork without being interrupted by a subordinate. Dkt. 127-13 at 141:4-142:16. By contrast, Roberts' deposition states that his managers would ask him to fix broken display signs after he finished his shift. Dkt. 127-10 at 127:24-128:8.

---

[14] Carter Hubbs worked at various Bradenton, Florida stores as an ADM and DM in the customer service department. *See* Dkt. 127-2 at 1; Dkt. 127-8 at 9:3-11:8.

There are also some types of "off-the-clock work" the Court finds surprising. Schafer asserts helping customers with product locations while conducting personal shopping on her day off is uncompensated overtime. Dkt. 127-14 at 187:17-188:23. Bridges stated, "Just kind of reflecting on my day to day" after a shift was off-the-clock work. Dkt. 127-15 at 56:2-13.

Finally, Plaintiffs' claims about working on meal breaks do not fare any better in supporting the similarly situated question. Sometimes, a fellow Publix employee needed help with a task. *See* Dkt. 127-12 at 155:11-156:8; Dkt. 127-14 at 77:9-20. Other times, a customer needing assistance interrupted the break. Dkt. 127-16 at 51:14-22, 111:25-113:2; Dkt. 127-15 at 72:21-73:15; Dkt. 127-11 at 109:9-22. Defendant also points out that a manager's lunch break is an hour long, and "no Plaintiff has suggested that any given interruption to a break lasted more than the 30 minutes needed to show an absence of a *bona fide* meal break." Dkt. 142 at 30. Even if there were instances of off-the-clock work lasting more than 30 minutes, it would also be an individualized inquiry into the Plaintiff's situation to determine when the instance happened, how long it took, and whether Publix knew or should have known it occurred.

At bottom, prior courts have "denied conditional certification where the putative class members were subject to different supervisors, different timekeeping practices, [] different job obligations and responsibilities," different geographical

locations, and different amounts of overtime work done, "thus necessitating plaintiff-specific inquiries." *Reyes v. Strada Servs. Inc.*, No. 8:21-CV-976-VMC-TGW, 2021 WL 4427079, at \*4 (M.D. Fla. Sept. 27, 2021); *see Lewis-Gursky*, 2017 WL 892604, at \*5; *Gibbs*, 2019 WL 2635746, at \*10; *Hart*, 2012 WL 6196035, at \*5. The eight depositions taken during the pre-notice discovery period reveal this case has varying, multitudinous, and significant differences in claims.

Plaintiffs rely heavily on alleged work texts that DMs and ADMs regularly receive while off-the-clock. Dkt. 127 at 15-16. Plaintiff submits it has "over 45,000 off-the-clock work-related text messages, which included off-the-clock text messages with store managers and assistant store managers." *Id.* at 16.[15] Publix argues Plaintiffs' texting claims suffer from the same fatal flaw as the pre-shift and post-shift claims; it would require "individualized liability inquiries that preclude collective certification." Dkt. 142 at 26. The Court agrees.

As an initial matter, Publix has a written policy prohibiting work-related communications on personal cell phones while off-the-clock. Dkt. 142 at 26; Dkt. 127-9 at 128:21-129:20. Publix has an obligation to enforce its written policy under the FSLA. *See Devries*, 2014 WL 505157, at \*6. Nevertheless, evaluating whether certain off-the-clock text messages should have resulted in compensation is precisely

---

[15] Plaintiffs have only provided the Court with a small sampling of the 45,000 text messages. *See* Dkt. 127-4 (showing Excel spreadsheets Plaintiffs created with text messages).

the individualized inquiries that augur against conditional certification. Indeed, for each Plaintiff, the parties would need to read every text message to determine which text messages were work-related and which ones were personal. *See* Dkt. 127-14 at 180:12-25 (Schafer acknowledging that when she looks at her phone after clocking off, there might be pending messages requiring her to sort through which are personal and which are work-related); Dkt. 127-11 at 122:13-19, 128:5-130:3 (Berry noting that a text conversation between himself and opt-in Plaintiff O'Danny Beaubien regarding Beaubien picking up ice from Berry's house was "purely personal" and admitting this line of questioning to sort out which texts were personal or work-related would need to be done for most messages); *see e.g.*, Dkt. 127-15 at 102:10-18; Dkt. 127-14 at 95:9-97:2, 169:13-22.

Moreover, another individualized determination on how long it took to read and respond to a work text would also be necessary to ascertain liability (i.e., whether reading and responding to a work text pushed a Plaintiff's total time worked beyond the 40-45 hour labor budget). *See e.g.*, Dkt. 127-8 at 87:25-89:6; Dkt. 127-14 at 182:10-22; Dkt. 127-15 at 103:7-22; Dkt. 127-12 at 60:1-16. If one multiplies these individualized inquiries across 20,000 or more potential opt-in plaintiffs who worked at well over 1,000 separate locations under different store managers, the "similarity" between potential opt-in plaintiffs suddenly becomes a distant afterthought.

Plaintiffs have repeatedly reminded this Court that the "ultimate merits are not presently" at issue in the notice stage. Dkt. 151 at 5; Dkt. 127 at 30 (citing *Moxley v. OS Rest. Servs., LLC*, No. 8:21-CV-1760-JLB-JSS, 2022 WL 1487589, at *3 n.3 (M.D. Fla. May 11, 2022)). The Court, however, is not adjudicating whether Jessica Schafer is entitled to three to five additional hours of overtime pay per week due to the text messages and phone calls she receives while off the clock. Dkt. 127-14 at 179:11-20. Nor is this Court deciding which texts count as "work-related" and which are personal as it reads Berry's messages about ice cream (for purposes of calculating Berry's unpaid overtime). Dkt. 127-11 at 128:5-130:3.

Rather, when considering the nature of Plaintiffs' texting claims, the Court is examining how vastly diverse Plaintiffs' claims are based on the five months of pre-notice discovery. These individualized differences will undoubtedly be compounded and amplified if the Court allows 20,000 to 25,000 potential opt-in plaintiffs, across 1,400 stores, in eight different states, and various departments to be joined together. The "mechanics" and unwieldy nature of such a suit counsel against conditional certification. *Lewis-Gursky*, 2017 WL 892604, at *5 ("Collective certification of a group this diverse would result in individualized inquiries that 'would contravene the basic theory of judicial economy upon which the certification of collective actions is based.'" (quoting *West v. Verizon Commc'ns, Inc.*, No. 8:08–cv–1325–T–

33MAP, 2009 WL 2957963, at *7 (M.D. Fla. Sept. 10, 2009))); *Gibbs*, 2019 WL 2635746, at *9 (same); *Hart*, 2012 WL 6196035, at *5 (same).

Put simply, the Court is not making a merits determination; it is assessing whether Plaintiffs are "similarly situated" enough for conditional certification. The Court exercises its discretion and denies certification of a collective action under the FLSA. *See Hipp*, 252 F.3d at 1217.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

1. Plaintiffs' Renewed Motion for Conditional Certification of FLSA Collective Action and Notice to Potential opt–in Plaintiffs, Dkt. 127, is **DENIED**.

2. Publix's Notices of Objection, Dkts. 144 & 145, are **DENIED as moot.**

3. The Court finds Plaintiffs' original motion for conditional certification, Dkt. 53, is **moot**.

**DONE AND ORDERED** at Tampa, Florida, on November 12, 2024.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record